**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Game Trading Technologies, Inc. | ) | Case No. 12-_____(   ) |
| Gamers Factory, Inc. | ) | Case No. 12-_____(   ) |
| | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Pending) |
| _____ | ) | |

**AFFIDAVIT OF MARC S. WEINSWEIG IN SUPPORT OF FIRST-DAY MOTIONS**

I, Marc S. Weinsweig being duly sworn, deposes and states, under penalty of perjury, that the following information is true to the best of my knowledge, information and belief.

### I.   BACKGROUND

**A.   Introduction**

1. I am a principal member of WeinsweigAdvisors LLC, the Chief Restructuring Officer ("CRO") of Game Trading Technologies, Inc. and Gamers Factory, Inc. and the proposed CRO of the Debtors in the above-captioned bankruptcy proceedings. In these capacities, I am familiar with the day-to-day operations, financial condition, books and records, and business affairs of the Debtors. I submit this Affidavit in support of the Debtors' chapter 11 petitions, first-day applications, and motions listed herein (the "First-Day Motions").

2. Except as otherwise indicated, all facts set forth in this Affidavit are offered to the best of my knowledge, information and belief and are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' management or professionals working with me or under my supervision, or my informed opinion based upon my experience and knowledge of the Debtors' industry, operations and financial condition. If I were

called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Affidavit on behalf of the Debtors.

3. To minimize any adverse effects on the Debtors' businesses as a result of the commencement of the Debtors' chapter 11 cases, the Debtors have requested various types of relief in the First-Day Motions. The First-Day Motions seek relief, among other things, to: (a) permit the continuation of the Debtors' cash management system and other business operations without interruption; (b) maintain employee morale and confidence; and (c) establish certain other administrative procedures to promote a smooth transition into chapter 11. Gaining and maintaining the support of the Debtors' employees, retail partners, and other key constituents as well as maintaining the day-to-day operations of the Debtors' businesses with minimal disruption will be critical to the Debtors' ability to maximize the recovery prospects for all interested parties. The relief requested in the First-Day Motions is in the best interest of the Debtors, their creditors and estates, and is necessary to avoid immediate and irreparable harm.

        **B.**      <u>**Overview of the Debtors' Business**</u>

4. Game Trading Technologies, Inc. is a publicly traded Delaware corporation (OTCBB: GMTD) that was formed in 2006 under the name City Language Exchange Incorporated. On February 25, 2010, the company's name was changed to Game Trading Technologies, Inc. ("GTTI"). Also on that date, GTTI acquired all of the issued and outstanding securities of Gamers Factory, Inc. ("Gamers"). As a result of that transaction, Gamers became the wholly-owned subsidiary of GTTI, with Gamers' former stockholders acquiring a majority of the outstanding shares of GTTI's common stock. Gamers was formed under the laws of Maryland on October 16, 2003 and remains the operating company of GTTI. GTTI and Gamers maintain their principal place of business in Hunt Valley, Maryland. Gross revenues for the

GTTI and Gamers in calendar years 2010 and 2011 were approximately $33.7 million and $27.4 million, respectively.

5. GTTI is a leading provider of comprehensive trading solutions for video game retailers, publishers, rental companies, charities and consumers. Through its trading platform, GTTI provides customers with value-added services including valuation, procurement, refurbishment, merchandising and distribution of pre-owned video games and related products. GTTI offers these customized solutions to leading specialty, mass, convenience, rental and online retailers, as well as directly to consumers through its website, www.gamersfactory.com.

6. The services of GTTI allow retailers to serve those customers who are seeking to monetize their existing video game collections, as well as those looking to purchase pre-owned videogames and related products. GTTI is among the largest trading solutions provider and distributor of pre-owned video games and related products to retailers in North America, and the only company to offer a comprehensive set of solutions to the pre-owned video game industry.

7. GTTI also owns a proprietary "market-making" algorithm technology that prices more than 10,000 pre-owned video games on a real-time basis. This "Pricing Engine" is analogous to the "Kelley Blue Book" of pre-owned video games.

8. GTTI's primary source of revenue is from the sale of pre-owned video games. GTTI generates its supply of pre-owned video games and related products through four primary channels: trade-in, off-rental, consumer returns and closeout and overstock programs. GTTI's multiple product sourcing channels enable it to acquire new releases, greatest hits and classic titles across all video game platforms. Once these products are acquired, GTTI is able to refurbish them for use on major platforms such as Nintendo, Sony and Microsoft. GTTI may

then re-merchandise and distribute these products to various leading retailers, as well as online directly to consumers.

### C. Events Leading to Bankruptcy

9. While GTTI initially achieved some relative success with its business model, it realized that certain segments of its business were part of a shrinking industry and that it would need to acquire additional financing and/or equity investments in order to continue to grow and execute its operating plan.

10. In May, 2010, GTTI engaged Roth Capital Partners and Janney Montgomery Scott to obtain additional equity via a public market secondary offering which was not successful.

11. On July 22, 2010, Gamers entered into a Sales Agency and Purchasing/Sales Services Agreement (the "Sales Agreement") with DK Trading Partners, LLC ("DK Trading"). Gregg Smith, a shareholder of GTTI, also holds a 2.5% membership interest in DK Trading. Pursuant to the Sale Agreement, DK Trading engaged Gamers to procure, purchase and sell up to $3,000,000 of pre-owned video games and associated packaging materials, together with such other merchandise as designated by DK Trading, on behalf of DK Trading, and in consideration for the services to be performed by Gamers under the Sales Agreement, Gamers was entitled to receive 100% of the net profit, if any, from the sale of products procured by DK Trading with the assistance of Gamers in excess of $600,000. The amounts due to DK Trading under the Sales Agreement are secured by a lien on all of Gamer's assets, and a UCC Financing Statement was filed on August 18, 2010 with the Maryland Department of Assessments and Taxation perfecting such security interest.

12. In February, 2011, GTTI engaged J.P. Turner to obtain additional equity via a private placement transaction, which was also ultimately unsuccessful. In June, 2011, GTTI

engaged Effective Partners LLC, a division of Financial Telesis, as its investment banker in order to assist GTTI in pursuing a possible transaction whereby GTTI would become a party to a change of control transaction and/or obtain additional equity investments. During the period from June, 2011 to September, 2011, GTTI contacted over twenty (20) parties to assess potential interest in acquiring GTTI and/or making an equity investment. GTTI entered into discussions with certain of these parties who performed varying levels of due diligence investigations of GTTI and its businesses. Ultimately, however, none were willing to commit to an acquisition or additional equity investment.

13. On October 13, 2011, GTTI engaged WeinsweigAdvisors LLC as its restructuring advisors to identify strategic options to address the liabilities and other considerations and issues facing the companies. On November 21, 2011, GTTI appointed me as its Chief Restructuring Officer and GTTI engaged in a new round of discussions commencing November 2011 by contacting over thirty (30) prospective purchasers. At least seven prospective purchasers were interested or strongly considered a transaction, and ultimately GTTI received non-binding letters of intent from two parties.

14. In November 2011, GTTI engaged in discussions with its secured creditor DK Trading with regard to the existing default and balance due of $960,000 under the Sales Agreement. On November 15, 2011, Gamers and DK Trading entered into a letter agreement amending the Sales Agreement in which Gamers and DK Trading agreed, *inter alia,* that in full settlement of the amounts due under the Sales Agreement, DK Trading would accept $700,000 in cash on or prior to January 6, 2012.

15. However, as the January 6, 2012 deadline approached, GTTI realized it was not able to make this payment to DK Trading under the amended Sales Agreement and negotiated a

Plan Support Agreement with DK Trading (the "Plan Support Agreement") by which the parties agreed, *inter alia,* that (1) DK Trading would receive $150,000 upon execution of the Plan Support Agreement; (2) DK Trading would consent to GTTI's use of DK Trading's cash collateral in the event of a chapter 11 bankruptcy filing; (3) DK Trading would support GTTI's plan of reorganization; (4) DK Trading would receive $50,000 upon the Effective Date of the Plan; (5) non-priority general unsecured creditors would receive a carveout of $50,000 from the proceeds of the sale of DK Trading's collateral; and (6) all United States Trustee fees and other court fees, priority claims and administrative claims would be paid in full.  As of the Petition Date, the balance due to DK Trading is $550,000, and the amount due to general unsecured creditors is approximately $10.6 million.

16. In conjunction with approving the Plan Support Agreement, GTTI's board of directors compared the value to be derived from one or more of the transactions outlined in the non-binding letters of intent received with that to be derived from an orderly liquidation of both Gamers and GTTI and determined that value would be maximized for the benefit of creditors through a bankruptcy filing for the purpose of promptly consummating one or more sale transactions with a successful bidder(s), subject to approval by the Bankruptcy Court.

17. To that end, the Debtors intend to file a Plan soon after the Petition Date that will be funded primarily from the proceeds generated by selling substantially all of the Debtors' assets, and provide for the distribution of sale proceeds among holders of claims pursuant to section 1123(b)(4) of the Bankruptcy Code.  Pursuant to the Plan Support Agreement, the Plan will propose to pay administrative and priority claims in full and a dividend of $50,000 to non-priority general unsecured creditors before DK Trading's allowed secured claim is paid in full.

## II. FIRST-DAY MOTIONS[1]

18. Concurrently with the filing of these chapter 11 cases, the Debtors filed a number of First-Day Motions. The Debtors anticipate that the Court will conduct a hearing soon after the commencement of these cases (the "First-Day Hearing"), at which the Court will hear the First-Day Motions.

19. An important and critical element of the success of these chapter 11 cases will be the entry of orders granting the relief requested in each of the First-Day Motions. Generally the First-Day Motions are designed to facilitate: (a) the continuation of the Debtors' existing cash management systems and other business operations without interruption, (b) preservation of customer and supplier relationships, (c) maintenance of employee morale and confidence, and (d) establishment of certain other administrative procedures to promote a smooth transition into chapter 11. The factual background in support of each First-Day Motion is provided below:

A. **Motion for Interim and Final Orders Pursuant to Section 366 of the Bankruptcy Code (i) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services, (ii) Deeming Utility Providers Adequately Assured of Payment for Future Utility Services, and (iii) Establishing Procedures for Determining the Adequate Assurance of Payment**

20. The Debtors seek the entry of an Interim Order and a Final Order, (i) prohibiting utility providers from altering, refusing or discontinuing utility services, (ii) deeming that the Debtors' utility providers have been provided with adequate assurance of payment for future services, (iii) establishing procedures for determining the adequate assurance of payment for future services, (iv) authorizing the Debtors' banks to honor any checks received by the Utility Providers prepetition for services which were not cashed as of the Petition Date, or replacement checks for any checks that were dishonored.

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the respective First-Day Motions.

7

21. In connection with the operation of their businesses in the ordinary course, the Debtors obtain Utility Services from a number of Utility Providers, and incur expenses for such services. Uninterrupted utility services are critical to the Debtors' ongoing ability to maintain their business, and therefore, to the success of these chapter 11 cases.

22. Generally, the Debtors have established a good and consistent payment history with the Utility Providers making regular, timely payments for expenses incurred. As of the Petition Date, the Debtors are current with its Utility Providers.

23. The Debtors propose to deposit a sum equal to approximately fifty percent (50%) of their average aggregate monthly payment of Utility Services, or $4,500, into an interest bearing segregated account maintained by the Debtors to provide adequate assurance of future performance to the Utility Providers.

B. **Debtors' Motion for an Order Authorizing Payment of Prepetition Wages, Compensation, Employee Benefits, Expenses Reimbursements and Related Items, and the Continuation of Certain Employment Policies in the Ordinary Course**

24. As of the Petition Date, the Debtors have approximately 18 Employees, consisting of corporate office Employees and salespeople. To minimize the personal hardships Employees will suffer if prepetition employee-related obligations are not paid, and to maintain Employees' morale at this critical time, the Debtors seek the authority to pay the Employee Obligations, as well as reimbursement of certain customary reimbursable expenses.

### Wages and Salaries

25. In the ordinary course of business, the Debtors incur payroll obligations to employees for the performance of services. The Debtors have salaried and hourly employees.

26. The Debtors utilize the services of an entity known as Paychex, Inc. ("Paychex") to outsource the company's benefits administration, human relations, payroll processing, and

workers' compensation.  The Debtors use Paychex largely to enable the Debtors to offer more competitive health insurance rates and other benefits that would be more costly or simply unavailable to a company that is not a large company.

27.     The Debtors enter payroll information online through a website managed by Paychex, Inc., and Paychex calculates the payroll obligations, prints the checks for employees who elect to receive paychecks, overnights the checks to the Debtors for distribution to employees and pays payroll taxes and other applicable deductions required by law.  Paychex also handles automatic deposits into employee bank accounts.

28.     Employees are paid (and payroll is funded) bimonthly, on the first and sixteenth days of each month.  Paychex electronically transfers the amount necessary to fund payroll (plus a fee for its services), on the first and sixteenth days of each month, from a Debtors' bank account, to cover payroll, taxes, and benefits.

### Employee Benefits

29.     In the ordinary course of business, the Debtors maintain Employee Benefits.  Full-time employees are eligible for Employee Benefits.  Part-time employees are not eligible for Employee Benefits.

30.     GTTI maintains an employee benefits policy pursuant to which employees are provided with certain sick time, paid holidays, and vacation pay.  Some employees have accrued paid time off as of the Petition Date, consistent with GTTI's current policy for paid time off.

31.     The Debtors also offer medical, dental, and vision coverage to its employees.  The Debtors offer a health plan (which includes dental and vision coverage), which are administered by United Health Care.  The premiums under these plans are paid partially by the Debtors and partially by the employees.  The percentage of the Debtors' contribution depends on the type of coverage chosen by the employee and the number of dependents covered by the selected plan.

These amounts are all funded as part of payroll in the manner described above. The health insurance plan also includes life insurance.

33. The Debtors estimate that, as of the Petition Date, Prepetition Payroll Obligations and Employee Benefits total approximately $33,051.25.

## Reimbursable Business Expenses

33. In the ordinary course of business, the Debtors reimburse employees for actual, reasonable and proper business and travel expenditure incurred in the normal course of their employment ("Reimbursable Expenses"). Employees typically incur Reimbursable Expenses through the use of their personal credit cards or own cash. As of the Petition Date, the Debtors estimate that unpaid Reimbursable Expenses do not exceed $10,000.

34. I believe that the Debtors' ability to maximize the recovery prospects for all interested parties depends on the retention and motivation of the employees during these chapter 11 cases. Most of the Debtors' employees (and their families) are dependent upon the wages, salaries, reimbursements and other benefits they receive from the Debtors.

35. If amounts owed are not paid, insurance reimbursements not made, or other benefits delayed, employees may suffer extensive personal hardship and in some cases will be unable to meet the "basic living" needs. This could cause significant harm to Employees and their families and potentially make it difficult or impossible for them to continue working for GTTI.

36. I believe that, to avoid the risk of such employee resignations and to maintain employee morale, it is critical that the Debtors be authorized to pay each of the Employees all compensation amounts, subject to the statutory caps provided in §§ 507(a)(4)(A) and (a)(5)(B) of the Bankruptcy Code, that have been earned under the Debtors' prepetition contractual

obligations or practices.  It is also essential that the Debtors continue the employee plans and policies discussed in the Motion in the ordinary course of business and on an uninterrupted basis.

      **C.**      **Debtors' Motion for an Order (i) Authorizing Debtors to Continue Use of Their Centralized Cash Management System, Existing Bank Accounts and Business Forms, and (ii) Waiving the Deposit and Investment Requirements of Section 345 of the Bankruptcy Code**

      37.      In the ordinary course of business, the Debtors maintain approximately four (4) Bank Accounts that operate as part of a centralized Cash Management System.  Through the Bank Accounts, the Debtors efficiently collect, transfer, and disburse funds generated from product sales.  The Debtors routinely deposit, withdraw, and otherwise transfers funds to, from, and between the Bank Accounts by various methods including check and wire transfer.

      38.      The Debtors maintain two bank accounts at M&T Bank (together, the "M&T Accounts").  One of the M&T Accounts is used to fund the Debtors' payroll obligations (the "Payroll Account"), and the other is used for the Debtors' sales and other operations, including but not limited to, payment of rent, utilities, professional fees, vendor obligations, and taxes (the "Operating Account").

      39.      In addition, the Debtors maintain one bank account at Columbia Bank (the "Columbia Account"), which exists for the sole purpose of receiving significant direct-deposit payments from GameStop (the "GameStop Receivables").  The Debtors expect the GameStop Receivables to clear the Columbia Account within ten (10) days of the Petition Date.  Once the GameStop Receivables have been received by the Debtors, the Debtors will promptly close the Columbia Account and discontinue their banking relationship with Columbia Bank.  The Debtors will notify the United States Trustee within three (3) business days of the closure of the Columbia Account.

40. The Debtors also maintain an account with PayPal, Inc. (the "PayPal Account"). PayPal is a third-party service provider that serves as the Debtors' agent with respect to funds transferred from purchasers using eBay. The PayPal Account contains no funds belonging to the Debtors. The PayPal Account allows the Debtors to maintain an online business through eBay, which generates approximately $10,000 in monthly revenue. All funds generated through online sales and processed through the PayPal Account will be promptly deposited into one of the M&T Accounts and used in the ordinary course of the Debtors' operations.

### The Debtors' Business Forms

41. In the ordinary course of business, the Debtors use numerous varieties of business forms. To minimize the expense to the estates and to avoid any confusion with suppliers, customers, and employees, the Debtors respectfully request that the Court authorize the Debtors to continue to use all business forms, including without limitation, checks, letterhead, customer program forms, purchase orders, contracts, and invoices, as such forms were used by the Debtors immediately prior to the Petition Date, without reference to the Debtors' status as a debtors in possession. Granting this relief will allow the Debtors to avoid the cost and delay of ordering new business forms. Upon depletion of the current stock of forms and checks, the debtors will obtain new checks and forms that indicate the debtor in possession status.

### Continued Use of a Cash Management System Is Warranted

42. The Debtors hereby seek authority to maintain the Cash Management System. The Cash Management System constitutes a customary and essential business practice. The Debtors' Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity. The widespread use of such systems, moreover, is attributable to the numerous benefits they provide, including the ability to

(a) control and monitor corporate funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating the movement of funds.

43. In light of the size and complexity of the Debtors' operations, the Debtors' efforts to preserve and enhance the value of their estates will be hampered if their cash management procedures are disrupted.

44. For much the same reasons, the Debtors further seek the authority to implement ordinary course changes to their Cash Management System, without further order of the Court, in the event that the Debtors conclude that changes in the Cash Management System are beneficial to the estates. In addition, the Debtors request authority to open and close bank accounts. The Debtors request that the banks be authorized to honor the Debtors' requests to open or close any bank accounts.

45. As set forth above, within their Cash Management System, the Debtors maintain numerous Bank Accounts. To avoid substantial disruption to the normal operation of their businesses and to preserve a "business as usual" atmosphere with respect to cash management function, as part of their request to maintain their Cash Management System, the Debtors hereby also request permission to continue to use their Bank Accounts. The Debtors request further that the Banks be authorized to continue to follow the instructions of all parties authorized to issue instructions with respect to the Bank Accounts. Allowing these accounts to be maintained with the same account numbers will assist the Debtors in accomplishing a smooth transition to operating in chapter 11.

46. To protect against the possible inadvertent payment of prepetition claims, the Debtors will immediately advise their banks not to honor checks issued prior to the Petition Date, except as otherwise expressly permitted by an order of the Court and directed by the Debtors.

47. The Debtors also seek a waiver of the requirement to establish specific bank accounts for tax payments. The Debtors believe that tax obligations can be paid most efficiently out of the existing Bank Accounts, that the U.S. Trustee can adequately monitor the flow of funds into, among and out of the Bank Accounts, and that the creation of new debtor in possession accounts designated solely for tax obligations would be unnecessary and inefficient.

### Waiver of Section 345 Requirements

48. The Debtors seek a waiver of section 345(b) of the Bankruptcy Code permitting the Debtors to maintain their Bank Accounts without the need to post a bond or other security if the funds deposited in their Bank Accounts exceed the limits of section 345.

49. The Debtors do not maintain any investment accounts of significance. In light of the amount of funds that will flow through the estates and the minimal balances in certain of the Bank Accounts, it would be unnecessary and inefficient for the Debtors to be forced to incur the expense of obtaining a bond given the safeguards embedded in the Debtors' Cash Management System for the preservation of the funds therein. The Debtors submit that their current practices provide sufficient protection for their cash and that it would be in the estates' best interests for the Debtors to continue to follow these practices. Moreover, the banks where the Debtors maintain their accounts are well-known and fiscally strong institutions, which provide services critical to the Debtors operations.

### D. Motion of the Debtors for an Order Directing Joint Administration of their Related Chapter 11 Cases

50. Given the affiliation between the Debtors and the integration of the Debtors' operations, joint administration of the chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders that will arise in the chapter 11 cases will affect both Debtors. The

entry of an Order approving joint administration will reduce fees and costs by avoiding duplicative filings and objections. Joint administration also will allow the Office of the United States Trustee for the District of Maryland and all parties in interest to monitor the chapter 11 cases with greater ease and efficiency.

51. Moreover, joint administration will not adversely affect the Debtors' respective constituencies because the motion requests only administrative, not substantive, consolidation of the estates. Thus parties in interest will not be harmed by the relief requested, but instead will benefit from the cost reductions associated with the joint administration of the chapter 11 cases. Accordingly, the Debtors submit that the joint administration of the chapter 11 cases is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**E.    Application for Authority to Employ McGuireWoods LLP as Counsel to the Debtors and Debtors in Possession**

52. The Debtors seek to retain McGuireWoods as their counsel because of the firm's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code.

53. The professional services that McGuireWoods will render to the Debtors include, but shall not be limited to, the following:

(a)    advising the Debtors of their rights, powers and duties as a debtors and debtors-in-possession;

(b)    advising the Debtors concerning, and assisting in the negotiation and documentation of a Chapter 11 plan and related transactions;

(c)    reviewing the nature and validity of liens asserted against the property of the Debtors and advising the Debtors concerning the enforceability of such liens;

(d) preparing on behalf of the Debtors all necessary and appropriate applications, motions, pleadings, draft orders, notices, schedules, and other documents, and reviewing all financial and other reports to be filed in these Chapter 11 cases;

(e) advising the Debtors concerning, and preparing responses to, applications, motions, pleadings, notices and other papers that may be filed and served in this Chapter 11 case; and

(f) performing all other legal services for and on behalf of the Debtors that may be necessary or appropriate in the administration of these Chapter 11 cases.

54. Subject to Court approval, compensation will be payable to McGuireWoods on an hourly basis, plus reimbursement of actual, necessary expenses incurred by the law firm.

55. I have been advised that McGuireWoods has not represented any creditors or any other parties-in-interest in any matters relating to the Debtors or their estates.

56. To the best of the Debtors' knowledge, based upon and as set forth in the Van Horn Affidavit, McGuireWoods does not hold or represent any interest adverse to the Debtors. McGuireWoods' employment is necessary and in the best interests of the Debtors and their estates.

### F. Application for Authority to Employ and Retain WeinsweigAdvisors LLC and Marc S. Weinsweig as Chief Restructuring Officer to the Debtors and Debtors-in-Possession

57. The Debtors are familiar with the professional standing and reputation of WeinsweigAdvisors. The Debtors understand that WeinsweigAdvisors has a wealth of experience in providing services in restructurings and reorganizations and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

58. Prior to the Petition Date, the Debtors engaged WeinsweigAdvisors to provide business and financial advice to the Debtors and subsequently appointed me as their Chief Restructuring Officer. As a result, WeinsweigAdvisors has developed a great deal of institutional knowledge regarding the Debtors' operations, finances and systems. This experience and knowledge will be valuable to the Debtors' ability to maximize value for their creditors. Further, Weinsweig Advisors is well qualified and able to represent the Debtors in a cost-effective, efficient and timely manner. Accordingly, the Debtors wish to retain WeinsweigAdvisors to provide assistance during these cases.

59. WeinsweigAdvisors has informed the Debtors that it (i) has no connection with the Debtors' creditors or other parties in interest in this case, (ii) does not hold any interest adverse to the Debtors' estates; and (iii) believes it is a "disinterested person" as defined within Section 101(14) of the Bankruptcy Code.

60. WeinsweigAdvisors will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new material facts or relationships are discovered or arise, WeinsweigAdvisors will supplement its disclosure to the Court.

### III. CONCLUSION

61. Approval of the First-Day Motions filed by the Debtors is a critical step for the Debtors to maximize the recovery prospects for all interested parties, as such approval will (a) facilitate the continuation of the Debtors' existing cash management systems and other business operations without interruption, (b) preserve customer and supplier relationships, (c) maintain employee morale and confidence and (d) establish certain other administrative procedures to promote a smooth transition into chapter 11.

Dated: January 30, 2012

/s/ Marc S. Weinsweig
Marc S. Weinsweig
Chief Restructuring Officer

\36135978